OPINION
{¶ 1} Defendants-appellants, Financing Solutions, Inc., dba Crest Construction, et al. (hereinafter "appellants"), appeal the judgment of the Crawford County Court of Common Pleas granting $52,500 in damages plus attorney fees in the amount of $6,302.95 to plaintiffs-appellees, Rod Millington and Loretta Adams (hereinafter "appellees"). For the reasons that follow, we affirm.
 {¶ 2} On September 22, 2003, Jerry Hughes, a salesman on behalf of Crest Construction, entered into a contract with the appellees for an addition to their home. The contract terms specified an addition be constructed to the house with a pitched, gabled roof, a cathedral ceiling, and two skylight windows. (Pl. Ex. 2). However, the roof that was initially built had a low-pitched roof line and was commonly known as a studio or shed-style roof. (Tr. 6/5/07, at 207).
 {¶ 3} In April or May 2004, Crest Construction was contacted about the roof leaking at the appellees' addition. (Id. at 156). Terrence McBride, general manager of Crest Construction, sent Matt McBride, a Crest Construction *Page 3 
employee, to the appellees' home on several occasions to repair the roof. (Id. at 265, 271). Unfortunately, the roof continued to leak. (Id. at 41).
 {¶ 4} As a result, Terrence sent Frank Malone to the appellees' home to determine the problem, and Malone concluded that the problem was due to the flashing. (Id. at 161-162). Malone discussed the roof issue with Terrance. Thereafter, Malone, on behalf of Crest Construction, built a gabled roof with skylights on top of the current roof. (Id. at 47; 162-165). However, the skylights were not "boxed in," and thus, were only visible from outside of the room. (Id. at 48).
 {¶ 5} According to Millington, the pitched roof did not fix the problem, but rather, redirected the leak. (Id. at 48). Malone testified that the problem, after the pitched roof was constructed, was due to condensation because the skylights had not been completed. (Id. at 252).
 {¶ 6} On January 23, 2006, the appellees filed a complaint against Financing Solutions Inc., dba Crest Construction; Financing Solutions; Mala McBride, as statutory agent; and Jerry Hughes for breach of contract, negligence, and claims under the Consumer Sales Practices Act.
 {¶ 7} A bench trial was held on June 5, 2007, and the parties submitted written closing arguments. The trial court stated that Crest Construction "put on a sloped flat roof, instead of a pitched gable roof; prepared the ceiling inside for a *Page 4 
flat ceiling, instead of a cathedral ceiling, and; did not properly install sky lights." (JE 6/28/07). The trial court entered judgment in favor of the appellees in the amount of $52,500.00 plus reasonable attorney fees against Financing Solutions, Inc. (Id.). The trial court also found that the evidence failed to establish any cause of action against Defendant Jerry Hughes and Defendant Mala McBride. (Id.).
 {¶ 8} An appeal was subsequently filed. On August 8, 2007, this court dismissed the appeal finding that the trial court's judgment was not a final appealable order because there was no specific order disposing of the claims against Jerry Hughes and Mala McBride, and the trial court awarded attorney fees but there was no indication as to the amount of the fees. Thereafter, the trial court entered judgment dismissing Jerry Hughes and Mala McBride from the action, entered judgment in favor of the plaintiffs and against defendants Financing Solutions, Inc., dba Crest Construction, and Financing Solutions in the amount of $52,500.00 and an additional $6,302.95 for attorney fees. (JE 10/19/07).
 {¶ 9} It is from this judgment that appellants appeal and assert two assignments of error.
 ASSIGNMENT OF ERROR NO. I THE PLAINTIFFS IN THIS MATTER FAILED TO ESTABLISH, BY PROPONDERANCE [SIC] OF THE EVIDENCE, THAT THE DEFENDANTS, FINANCE SOLUTIONS, INC., D.B.A. CREST CONSTRUCTION, BREACHED THE CONTRACT IN THE MATTER BEFORE THE TRIAL COURT. THE PLAINTIFFS FAILED TO MEET *Page 5 THE BURDEN OF PROOF THAT A BREACH OF THE CONTRACT FOR THE HOME REPAIRS OF THE PLAINTIFFS' HOME WAS COMMITED. AND THE TRIAL COURT ERRED THAT PLAINTIFF'S "EXHIBIT 2" CONSTITUTED THE SOLE "ARGUMENT" SIC. BETWEEN THE PARTIES AND CONSTITUTES A VALID, LEGAL, AND ENFORCEABLE CONTRACT AND THAT THE ALLEGED DAMAGES TO THE PLAINTIFFS PROXIMATELY RESULTED FROM THE DEFENDANTS' BREACH WITHOUT TAKING INTO CONSIDERATION THE EVIDENCE PRESENTED CONCERNING THE ACTUAL CONTRACT AND THE DEFENDANTS' EXHIBIT WHICH DEMONSTRATED A NOVATION AND AMENDMENT OF THE CONTRACT BASED UPON THE ACTUAL PAYMENT OF THE FIRST DRAW TO THE DEFENDANTS AND THE ACCEPTANCE BY THE PLAINTIFFS OF THE FINAL JOB AS EXHIBITED BY DEFENDANTS' "EXHIBIT I". THE COURT FURTHER ERRED IN DETERMINING THAT, BASED UPON THE TESTIMONY OF THE PLAINTIFFS' WITNESS, PHILLIP RITTENOUR, THAT THE DAMAGES COMPLAINED OF WERE ESTABLISHED BASED UPON THAT TESTIMONY AND THE RESULTANT WRITTEN ESTIMATE. (DECISION AND JUDGMENT ENTY JOURNALIZED 6-28-07, TRIAL COURT, P. 3-4)
 {¶ 10} In their first assignment of error, the appellants argue that the appellees failed to establish a breach of contract. According to the appellants, the appellees failed "to establish that the contract had not been amended and accepted as amended," and there was no evidence that the addition was uninhabitable and must mostly be redone. Further, the appellants argue that the appellees accepted the work, which did not include a gabled roof or skylights. The appellants *Page 6 
maintain that the trial court's award of $17,500.00 was against the manifest weight of the evidence.
 {¶ 11} "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence."C.E. Morris Company v. Foley Construction Co. (1978), 54 Ohio St.2d 279,280, 376 N.E.2d 578, citations omitted. The trial court is in the best position to observe the witnesses and weigh the credibility of the testimony. Seasons Coal Company, Inc. v. City of Cleveland (1984),10 Ohio St.3d 77, 80, 461 N.E.2d 1273.
 {¶ 12} Rod Millington testified: he wanted an addition built on his residence; he found Crest Construction in the telephone book and called Crest Construction; and they sent a salesman named Jerry Hughes to his residence. (Tr. 6/5/07 at 23-24). Millington further testified that on September 22, 2003, he and his fiancée entered into a contract with Crest Construction for an addition to be built onto his residence for twelve thousand three hundred thirty-six dollars ($12,336). (Id. at 20-22, 24). Crest Construction was not to do the finish, drywall, insulation, trim work, or laying the hardwood floors under the contract. (Id. at 24; Pl. Ex. 2).
 {¶ 13} Millington paid Crest Construction the sum of $4,112 by check on November 21, 2003, a check for $4,112 on December 14, 2003, and a check for *Page 7 
$2,962 on January 3, 2004. (Id. at 26-28; Pl. Ex. 3; Pl. Ex. 4; Pl. Ex. 5). Millington withheld $1,000 of the amount due. (Id. at 28). Millington testified that he had ordered a cathedral ceiling with two skylights, but instead, got a flat rubber roof with no skylights that leaked. (Id. at 32-33). According to Millington, he told Tom (last name unknown), the person that Crest Construction sent to the residence, that he was not happy with the way the addition was constructed "many, many, many times." (Id. at 32).
 {¶ 14} Before Crest Construction even left, there were problems on the south side of the addition and the drywall started to get wet. (Id. at 33). Millington testified that Crest Construction repaired the soffit and faccia, repaired the rubber roof where it seamed together. (Id. at 33-34). When Millington called Crest Construction, they would send Matt to repair it, and Matt placed Kills on the water spots. (Id. at 34). According to Millington, Matt came to the residence at least twenty times to try and repair the leak. (Id. at 44).
 {¶ 15} Millington went up to Crest Construction's office in Mansfield and talked to Terrance. (Id. at 44). After the meeting, another subcontractor named Frank Malone showed up at the residence, and this occurred about a year and a half after Crest Construction left the job site. (Id. at 45). Malone put on a gabled roof with skylights. (Id. at 47). The skylights could be seen from outside the home, but the sky lights were not "boxed in." (Id. at 48). No one had cut through *Page 8 
the drywall and ceiling to let light through the skylight and the skylight was not accessible. (Id. at 48). Millington testified that he never received a telephone call from Malone and Crest Construction never left a note regarding an appointment to "box in" the skylights. (Id. at 48).
 {¶ 16} According to Millington, the pitched roof did not fix the problem but merely redirected the leak. (Id. at 49). Millington testified that there was a "light in the southeast part of the house in the same room", that water was going right down into the light fixture, and so he "taped [the] light fixtures so nobody could turn them on, because [he] didn't want to start a fire." (Id. at 36). Further, Millington testified that he "quit using [his] room because * * * [he] didn't want to start a fire." (Id. at 37). Millington testified that: the whole pool table is wet; he had to put a tarp over 90% of the room; a portion of the floor was damaged; there was mold in the basement and there had never been a problem with mold in the past; and J.D. Basements is charging $5,353 to clean up the damage to the basement. (Id. at 50, 54).
 {¶ 17} Millington testified that Terrance told him that he could not do the addition for the price quoted by Hughes because Hughes underbid the contract. (Id. at 54-55). Further, Millington testified:
 Q. So what was Mr. Terrence McBride's suggestion to you, as far as the contract or did he make one?
 A. To the best of my recollection, I don't recall him giving me any offers or anything like that. *Page 9 
 Q. So are you stating that the contract you entered into with Crest Construction, the original contract, the contract has never been changed?
 A. No.
 Q. You never signed — you never signed an amendment to the contract, did you?
 A. No, sir.
(Id. at 55-56).
 {¶ 18} On cross-examination, Millington testified that after Malone left, he called him and told him that the skylights were leaking, and Malone told him the skylights were not leaking, but that it was condensation. (Id. at 73-74). Further, Millington testified that Malone told him that he had to come back to finish the skylights but there was never an appointment, and no one from Crest Construction called him to let him know that they were having a problem meeting with each other to box out the skylights. (Id. at 74-75). Millington testified that Adams works days and he works nights, and that there is only a half hour or fifteen minute time frame when no one is home. (Id. at 77).
 {¶ 19} In addition, Millington learned there were no gutters and down spouting to the north and the south on his home, and that Seamless Gutters estimated it would cost $11,000 for gutters for the whole home. (Id. at 82-83). According to Millington, the brown spots on the ceiling continue to grow bigger and darker. (Id. at 94). *Page 10 
 {¶ 20} Loretta Adams, lives with Rod Millington, and testified that the ceiling had leaked into the light fixtures and they needed to fix the drywall where the light fixtures were located. (Id. at 99, 103). Adams testified that she had called Terrance and told him that the ceiling collapsed, and that on August 31, 2005, Malone showed up to assess the damage. (Id. at 105). After Malone showed up, the roof continued to leak but leaked in new places. (Id. at 106). According to Adams, the ceiling is still leaking and it is getting worse; Crest Construction made many attempts to fix the roof; there are still blue tarps all over the room; and it leaks when it rains. (Id. at 113, 115-116).
 {¶ 21} In regards to the terms of the contract and whether there were any amendments, Adams testified:
 Q. Okay. Now, as far as the contract that you signed with Crest Construction stating that you are to receive a cathedral ceiling inside, a gabled roof, siding to match, gutters, soffit, et cetera, to your knowledge, was that contract ever amended?
 A. No.
 Q. It was never changed?
 A. No. We never signed anything different.
 Q. Okay. So far as your knowledge, this contract that I showed you that has been marked as Plaintiffs' Exhibit 2, that's what you wanted?
 A. Correct.
 Q. Okay. And no one ever told you that you're going to get anything different?
 A. No.
 Q. Okay. To your knowledge, did Terrance McBride ever speak to you about changing the contract?
 A. No. *Page 11 
(Id. at 112-113).
 {¶ 22} Phillip Rittenhour, an individual who was employed with the City of Bucyrus Fire Department and who has been in construction for approximately twenty-five years, testified that he gave Millington and Adams an estimate to repair their roof. (Id. at 9-10; Pl. Ex.1). Rittenhour visited the home at the end of December 2005, and gave an estimate on January 1, 2006. (Id. at 15). The estimate included: "removing the existing roofs; build the wall up to normal height, eight foot all the way around; replace the roof with a vaulted ceiling* * *; and complete the interior; insulation; install skylights* * *." (Id. at 11; Pl. Ex.1). Rittenhour quoted Millington and Adams a price of $17, 500.
 {¶ 23} Rittenhour testified that the ceiling had water spots where it had leaked. (Id. at 13). Rittenhour did not: go up on the roof; talk to any representative from Crest Construction; and did not talk to Malone. (Id. at 17). Rittenour testified:
 THE COURT: So help me out with this. I'm trying to visualize.
 You have a gabled roof up here and, in what would be the attic area, you have another roof?
 A. Yeah. The original roof that was put on to start with, and then they came over and built a gabled roof right on top of that.
 THE COURT: Would you call that a good practice?
 A. Not as a firefighter, I wouldn't.
 THE COURT: How about as a contractor?
 A. Nor as a contractor.
(Id. at 19). *Page 12 
 {¶ 24} Terrance McBride, the general manager at Crest Construction and an individual who has been in the construction business full time since 1980, testified that Hughes represented Crest Construction in a sales capacity on September 22, 2003. (Id. at 136, 141). Terrance further testified that the contract said pending approval by the company; he was the person responsible for approving the contract; and he did not approve the contract. (Id. at 142). According to Terrance, he could not do the contract for that amount of money because Crest Construction would lose money. (Id. at 153). Terrance testified that the contract should have been priced six or seven thousand dollars more, and that even as low as sixteen thousand for the contract would have been acceptable. (Id. at 175).
 {¶ 25} Terrance testified that he met with the Millingtons[1] the Saturday after September 22, and at that point, no work had been started and no money had been paid. (Id. at 143, 202). The purpose of the meeting was to inform them that the work could not be done for the agreed upon price, and Millington and Adams agreed to change the roof from a gabled roof to single slope studio or single shed roof. (Id. at 143). Terrance stated, "* * * we clearly had an understanding and an agreement that the agreement was being changed * * *." (Id. at 147). Terrance could not produce a document to show that the contract had been amended. (Id. at 143-144). *Page 13 
 {¶ 26} Terrance testified that the construction began in November. (Id. at 148). Terrance testified that he went back to the residence when the siding was going on the addition, that you could see there were no skylights or a gabled roof, and neither Millington nor Adams said anything to him at that point. (Id. at 207-208).
 {¶ 27} In April or May 2004, Terrance first learned of the roof leak. (Id. at 155, 156). Crest Construction sent a crew out to determine the source of the leak and whether it was a flashing issue or an adhesion issue. (Id. at 157). At that time, they believed the problem to be an adhesion problem, and they attempted to fix the problem. (Id. at 156-158). However, the leakage problem was not fixed. (Id. at 160).
 {¶ 28} After Crest Construction had run multiple service calls, Terrance sent a different crew leader named Malone to the residence. (Id. at 161). Malone concluded the problem was the flashing. (Id. at 162). Terrance testified:
 A. The remedy — we could fix the flashing, but after a conversation that I had with [Malone] and after he had met with Rod Millington, Sue Adams, he basically said that, you know, Terry, I can fix it, but fixing is never going to make them happy. It's going to cost money, but I think if we built the roof that I was describing, it would make them happy and we wouldn't have to worry about going back again. So I agreed to build the roof.
(Id. at 162). Malone then built the gabled roof on top of the sloped roof. (Id. at 162). Terrance further testified that Malone was not able to get in the house to *Page 14 
finish the skylights from the inside. (Id. at 167). Terrance did not get a hold of Millington and Adams about getting inside the home, and that it was Malone's job to get a hold of them. (Id. at 168-169).
 {¶ 29} In regards to remedying the problem, Terrance testified:
 Q. You have heard about the complaints. You've seen the pictures that the Plaintiffs have presented. If given the opportunity — if you were given the opportunity to repair and remedy those conditions, what would you do?
 A. My opinion to remedy, I do believe that with the gabled roof in place and the fact that that is — if you look at the pictures, it's a cut valley. It is absolutely nonsensical that we would have — we would have rain water, okay, affecting that room. It is very, very possible — I can't tell you how the insulation was installed. It is very possible to have condensation in the room. Condensation is a reality, you know, in some homes. Okay. You know, my suggestion would be to remove the drywall on the ceiling, remove the insulation, make certain that the insulation is not making contact with the underside of the sheeting. At that point in time, make the cuts for the cases to the skylights, reinstall the — reinstall the fiberglass, the insulation, and hang drywall.
(Id. at 216). Terrance estimated that the cost to do the aforementioned repair would be between twenty two and twenty-five hundred dollars. (Id. at 217).
 {¶ 30} Frank Malone, an individual who does carpentry and roofing and has acted as a subcontractor for Crest Construction, met with Millington in late August or early September. (Id. at 242; Id. at 243). Malone did not see an actual leak but saw evidence of a leak. (Id. at 244). Malone testified that the leaks were on the sides of the addition and "[i]t's like the metal had lifted up." (Id. at 245). Malone *Page 15 
testified about a possible remedy of cutting "a strip all the way around the drip, and then put in another piece, and then seam it" which would cost roughly $200 for labor plus the cost of the materials. (Id. at 246).
 {¶ 31} Malone testified that Terrance authorized the project, and that he installed the roof and skylights, but he was not able to complete the installation of the skylights because he could not get into the home. (Id. at 247, 250-251). Malone did not receive a telephone call from Millington after the work was completed. (Id. at 251). Further, Malone testified regarding the effect that not being able to get into the residence to install the skylight and stated, "the sun would hit that glass, and it would create condensation. * * * it would sweat. It would have to because it's going down hitting another structure that's insulated, so it's going to create condensation, so it might sweat." (Id. at 251; 252).
 {¶ 32} On cross-examination, Malone testified that he was "pretty sure" that he had seen an amendment to the original contract. (Id. at 259). In addition, Malone stated "I don't know if it was an actual legal for, contract, but I had read an addendum to that, because that room couldn't be built for that money. It's theoretically impossible. I do it for a living. I'm in a corporation, too. I own my own company. There is no labor cost in that." (Id. at 262). *Page 16 
 {¶ 33} Matt McBride was employed by Crest Construction and testified that he saw the inside of the addition and said there were maybe two dime sized spots on the ceiling and that he had not seen the pool table wet. (Id. at 265, 268).
 {¶ 34} The first issue we must address is whether the September 22, 2003 contract applies, or whether the contract had been amended.
 {¶ 35} "It is universally recognized that where a building or construction contract, public or private, stipulates that additional, altered, or extra work must be ordered in writing, the stipulation is valid and binding upon the parties, and no recovery can be had for such work without a written directive therefor in compliance with terms of the contract, unless waived by the owner or employer." Foster WheelerEnviresponse, Inc. v. Franklin County Convention FacilitiesAuthority (1997), 78 Ohio St.3d 353, 360, 678 N.E.2d 519, citations omitted; 18 Ohio Jurisprudence 3d. (2008), Contracts, Section 172, citations omitted. The aforementioned "stipulation is valid and binding upon the parties to the contract, and no recovery can be had for such work without a written directive in compliance with the terms of the contract, unless the requirement is waived and is treated as being for the benefit of the owner." 18 Ohio Jurisprudence 3d. (2008), Contracts, Section 172, citations omitted.
 {¶ 36} The Ohio Supreme Court has previously stated that the proof of a waiver "`must either be in writing, or by such clear and convincing evidence as to *Page 17 
leave no reasonable doubt about it.'" Foster Wheeler Enviresponse,Inc., 78 Ohio St.3d at 364, quoting Ashley v. Henahan (1897),56 Ohio St. 559, 47 N.E. 573, paragraph five of the syllabus.
 {¶ 37} The terms of the September 22 contract called for an addition to the house with a pitched, gable roof, a cathedral ceiling, and two sky light windows. (Pl. Ex. 2). The contract provided: "[t]his agreement constitutes the entire understanding of the parties and no extra work or changes under this contract will be recognized unless agreed to in writing before the work is done or the changes made." (Pl.Ex.2).
 {¶ 38} The terms of the contract clearly provide that no changes or extra work will be recognized unless agreed to in writing and, as previously noted, such an agreement is valid and binding upon the parties. Foster Wheeler Enviresponse, Inc., 78 Ohio St.3d at 360. Although Terrance testified that Millington and Adams agreed to the changes, he could not produce any written documents that showed that the contract had been amended. (Tr. 6/5/07 at 143, 144, 147). As a result, there was clearly no written waiver of the terms of the contract.
 {¶ 39} In addition, there was no clear and convincing evidence that a waiver had occurred. Both Millington and Terrance agree that Terrance went over to the residence after the initial contract was signed to discuss the fact that the contract was underbid. (Id. at 54, 202-203). Millington testified that he does not *Page 18 
recall Terrance giving any other offers, and that he never signed an amendment to the contract. (Id. at 56). Moreover, Millington's testimony indicated that he believed he was not getting the roof for which he had contracted. Millington testified that he talked to Tom (last name unknown), a subcontractor sent to his home, "[t]he rubber roof was laid, and I asked him, you know, We got a cathedral ceiling" and that he told him he was not happy "many, many, many times." (Id. at 31, 32). Thus, there is not clear and convincing evidence that a waiver had occurred.
 {¶ 40} The language of the contract provided: "[t]his agreement is made pending approval of an officer of the company. If work begins, no approval is necessary." (Pl. Ex. 2). Terrance testified that the contract says pending approval by the company, that he was the person responsible for approving agreements, and that he did not approve the contract. (Id. at 142). However, the contract also provides that if the work begins, then no approval is necessary, and the work under the contract was begun. (Pl. Ex. 2)
 {¶ 41} The evidence indicates that Millington and Adams entered into a contract with Jerry Hughes, on behalf of Crest Construction, for an addition with a cathedral ceiling and two skylights to be built to their home. (Pl. Ex.2; Tr. 6/5/07 at 31). The initial roof that was built was a low pitched roof line, known as a studio or shed style roof, with no skylights. (Id. at 31, 207). In addition, the roof *Page 19 
that was initially installed leaked. (Id). Crest Construction sent a crew to fix the leaks; however, the roof continued to leak. (Id. at 271, 41). Crest Construction sent Frank Malone to fix the roof. (Id. at 161-162). Malone built a pitched gable roof with two skylights on top of the existing flat roof. (Id. at 47, 161-162). However, the skylights were never boxed in, and the roof either continued to leak or had a problem with condensation. (Id. at 48, 252).
 {¶ 42} After reviewing the evidence, we find that the evidence presented shows that the appellees did not get what they contracted for in the September 22 contract.
 {¶ 43} Although the appellants argue that there was no evidence that the addition was uninhabitable and must mostly be redone, the trial court could reasonably reach those conclusions based on the evidence that was presented during the trial. Both Millington and Adams testified that after the second roof was put on the leak was redirected and was located in the vicinity of a lighting fixture, and that they could not use the lights in the room. (Id. at 36-37, 103). In addition, both Millington and Adams testified that they had tarps covering most of the room. (Id. at 50, 115-116). Rittenhour testified that he provided Millington and Adams with an estimate to repair their roof of $17,500. (Id. at 10, 11). Rittenhour's estimate included: removing the existing two roofs, building the wall up to a normal height of eight feet; replacing the roof with a vaulted ceiling; *Page 20 
completing the interior, including insulation; and installing the skylights. (Id. at 11).
 {¶ 44} Although the estimate to repair the roof exceeds the initial contract price of $12,336, the estimate includes the cost of taking down the two roofs that were put up by Crest Construction. In addition, the estimate includes work on the inside of the room not contemplated by the initial contract, but which was damaged due to the roof leak.
 {¶ 45} After reviewing the record, we find that there was competent credible evidence to support the trial court's award of $17, 500 for the repair.
 {¶ 46} The appellant's first assignment of error is, therefore, overruled.
 ASSIGNMENT OF ERROR NO. II THE PLAINTIFFS IN THIS MATTER FAILED TO ESTABLISH, BY A PROPONDERANCE [SIC] OF THE EVIDENCE, A VIOLATION UNDER THE CONSUMER SALES PRACTICES ACT AND, SPECIFICALLY, FAILED TO DEMONSTRATE UNDER 1345.02 OR 1345.03 OF THE OHIO REVISED CODE, A SPECIFIC UNCONSCIONABLE ACT OR DECEPTIVE PRACTICE BASED UPON THE TESTIMONY PRESENTED BY THE PLAINTIFFS AND TOTALLY FAILED TO DEMONSTRATE A VIOLATION JUSTIFYING THE AWARD OF TREBLE DAMAGES AND ATTORNEY'S FEES. BASED UPON THE PLAINTIFFS' FAILURE, THE COURT ERRED IN AWARDING TREBLE DAMAGES AND ATTORNEY'S FEES PURSUANT TO 1345.09 OF THE OHIO REVISED CODE. (DECISION AND JUDGMENT ENTRY JOURNALIZED 6-28-0, TRIAL COURT, p. 5-6). *Page 21 
 {¶ 47} The appellants argue, in their second assignment of error, that the trial court's holding was against the manifest weight of the evidence in that the award of treble damages was based upon "the lack of establishment by the Plaintiffs that the sum of Seventeen Thousand, Five Hundred dollars ($17,500.00) was a proper award of damages." Further, the appellants argue that there was no evidence that they had committed an unconscionable or deceptive act pursuant to R.C. 1345.02, 1345.03, orErie Shore Builders, Inc. v. Leimbach (July 13, 2001), 6th Dist. No. H-99-034.
 {¶ 48} As this court has previously noted, the Ohio Consumer Sales Practices Act "prohibits a supplier from committing unfair, deceptive, or unconscionable acts or practices in consumer transactions." Ward v.Geiger, 3d Dist. No. 14-05-14, 2006-Ohio-6853, ¶ 37, citing R.C. 1345.01
et seq. Specifically, R.C. 1345.02 prohibits a supplier from committing an unfair or deceptive act, while R.C. 1345.03 prohibits suppliers from committing unconscionable acts. R.C. 1345.02; R.C. 1345.03. A violation of R.C. 1345.02(B) "does not require that the deception be knowing or intentional." Erie Shore Builders, Inc. (July 13, 2001), 6th Dist. No. H-99-034, *2. However, R.C. 1345.03(B) "requires that the supplier has knowingly taken advantage of the consumer." Id.
 {¶ 49} In regards to damages, R.C. 1345.09(B) provides: *Page 22 
 Where the violation was an act or practice declared to be deceptive or unconscionable by rule adopted under division (B)(2) of section 1345.05 of the Revised Code before the consumer transaction on which the action is based, or an act or practice determined by a court of this state to violate section 1345.02 or 1345.03 of the Revised Code and committed after the decision containing the determination has been made available for public inspection under division (A)(3) of section 1345.05 of the Revised Code, the consumer may rescind the transaction or recover * * * three times the amount of his actual damages or two hundred dollars, whichever is greater * * *.[2]
 {¶ 50} The trial court found that Crest Construction had "violated the Ohio Consumer Sales Practices Act by failing to deliver the goods promised and performing in a shoddy and unworkmanlike manner pursuant to R.C. 1345.02 and 1345.03." (JE 6/28/07). The trial court further found that the violation justified an award of treble damages and granted judgment to Millington and Adams in the amount of $52,500 plus attorney fees in the amount of $6,302.95. (Id.)
 {¶ 51} This court has already determined under the appellant's assignment of error number one that the trial court's award of $17,500.00 was not against the manifest weight of the evidence. Thus, we need not address the appellants' argument regarding any lack of establishment of the damages in the amount of $17,500.00.
 {¶ 52} In Erie Shore Builders, the Sixth District stated:
 In its second assignment of error, appellant argues that the trial court erred in finding that appellant engaged in violations of *Page 23 R.C. 1345.02 and 1345.03 for failure to work in a workmanlike manner. Based upon the testimony and exhibits presented at trial which depicted the tree that was removed, the shrubs which were damaged, and the water damage caused by a leak in the bathroom installed by appellant, we cannot say that the trial court erred in finding that appellant violated R.C. 1345.02 and 1345.03.
6th Dist. No. H-99-034, *3.
 {¶ 53} Similarly, we cannot find that the trial court erred in finding that the appellant violated R.C. 1345.02 and 1345.03 for failing to perform work in a workmanlike manner. There was evidence that the roof leaked, and that the roof continued to leak even after the second roof was built. Given this evidence, we cannot find that the trial court erred in finding that the work was performed in an unworkmanlike manner and violated R.C. 1345.02 and R.C. 1345.03, the Consumer Sales Practices Act.
 {¶ 54} The appellants' second assignment of error is, therefore, overruled.
 {¶ 55} Having found no error prejudicial to appellants herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment Affirmed.
 WILLAMOWSKI, J., concurs. ROGERS, J., dissents.
[1] The transcript refers to them as the Millingtons; however, we presume that Terrance was referring to Millington and Adams, who were not married.
[2] The applicable version of this statute in the present case is 1978 H 681, eff. 8/11/78. This statute has since been amended. *Page 1